**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT BACOS, ALIN POP, and ANDREI TOMESCU, individually and on behalf of all those similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 26-CV-3706 |
| | ) | |
| v. | ) | |
| | ) | **Class Action** |
| CALABASAS BEVERAGE COMPANY, LLC and K&SODA INC d/b/a 818 SPIRITS INC. | ) | **Jury Trial Demanded** |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs ROBERT BACOS, ALIN POP, and ANDREI TOMESCU on behalf of themselves and all those similarly situated, bring this Class Action Complaint against Defendants, alleging as follows:

**INTRODUCTORY STATEMENT**

1. This is a consumer class action arising from the marketing, labeling, and sale of tequila products represented as "100% agave," and "small batch." Plaintiffs ROBERT BACOS, ALIN POP and ANDREI TOMESCU, bring this action on behalf of themselves and others similarly situated against Defendants Calabasas Beverage Company, LLC and K&Soda Inc. d/b/a 818 Spirits. ("Defendants").

2. Defendants market and distribute the premium tequila brand *818*, throughout Illinois, Wisconsin, Minnesota, and the United States.

3. This action arises from the deceptive, unfair, and misleading promotion of 818 Tequila products in the states of Illinois, Wisconsin, Minnesota, and throughout the United States.

4. Defendants represent on product labels, third-party websites, and marketing materials that the 818 Tequila products are made from “100% agave” or “100% Blue Weber agave”.

5. These representations convey to reasonable consumers that the alcohol content of the products is derived solely from fermented sugars of the blue Weber agave, consistent with legally recognized tequila production standards, and that the product complies with applicable regulatory requirements associated with “100% agave” tequila, including the expectation that no non-agave sugars or undisclosed additives are used to influence the character, flavor, or composition of the tequila.

6. Also, Defendants represent on product labels, third-party websites, and marketing materials that 818 Tequila is “handcrafted” and made in “small batch.”

7. “Small batch” on a tequila label signals craftsmanship, suggesting careful, hands-on production rather than mass manufacturing. It conveys higher perceived quality, leading consumers to expect better ingredients and flavor control. The term also implies scarcity, creating a sense of limited availability and exclusivity. It reinforces authenticity, associating the brand with tradition and artisanal heritage. Finally, it supports premium positioning, helping justify a higher price point in the consumer’s mind.

8. “Handcrafted” on a spirits label communicates that the product is made using traditional, small-batch methods with meaningful human involvement rather than

automated industrial production. In the premium tequila market, including brands like 818, that representation can influence purchasing decisions because consumers often associate it with higher quality, authenticity, and closer oversight.

9. In order to artificially inflate the prices of 818 Tequila products during the Class Period (defined below), Defendants misrepresented both the nature of the alcohol contained in 818 Tequila and the methods used in its production, conduct that constitutes unfair and deceptive practices.

10. Plaintiffs allege that these representations were material to their purchasing decisions and enabled Defendants to charge premium prices.

11. Reasonable consumers, including Plaintiffs, interpret the representations "100% Agave," "handcrafted," and "small batch" on the product label to mean that the tequila is produced exclusively from agave sugars and manufactured using traditional small-scale methods rather than large-scale industrial processes. Each of these misrepresentations contributed to the price premium paid for 818 Tequila.

12. Plaintiffs further allege that independent scientific testing shows that 818 Tequila products labeled as "100% agave" contain alcohol derived, in material part, from non-agave sources.

13. Contrary to representations suggesting small-batch production, 818 is produced through large-scale industrial operations located in the Mexican state of Jalisco. On its website, Defendant 818 Spirits Inc. states: "In 2021, we moved our production to a brand-new, state-of-the-art distillery in Jalisco at Grupo Solave[1]," which contradicts the

[1] *See* https://drink818.com, website visited by Counsel, last visited March 11, 2026.

"handcrafted" and "small batch" production claims.

14. 818 Tequila is sold through a wide network of retailers across the United States, including major national and regional chains and local liquor stores. The products are widely available in Illinois, Wisconsin, and Minnesota, where they are sold through grocery stores, liquor retailers, and other outlets, and are marketed to consumers through uniform labeling, packaging, and promotional materials.

15. Relying on the allegedly misleading characterization of the product, Plaintiffs and the Class Members (defined below) purchased 818 Tequila products and paid a price premium compared to what they would have paid had the true nature and production of the products been fully disclosed.

16. As such, Plaintiffs seek damages, restitution, injunctive relief, and other appropriate relief under state law, on behalf of themselves and, as class representatives, on behalf of those similarly situated.

## NATURE OF THE ACTION

17. Plaintiffs, Robert Bacos, Alin Pop and Andrei Tomescu, on behalf of themselves and all similarly situated Class Members, seek damages, declaratory and permanent injunctive relief, disgorgement of unlawfully obtained monies, attorneys' fees and costs, and such other relief as the Court deems appropriate from Defendants Calabasas Beverage Company, LLC, and K&Soda Inc. d/b/a 818 Spirits Inc. based on claims for unjust enrichment, negligent misrepresentation, and violations of state consumer protection laws, including the Illinois Uniform Deceptive Trade Practices Act, Illinois Consumer Fraud and Deceptive Business Practices Act, Minnesota's Unlawful Trade Practices Act,

Minnesota Uniform Deceptive Trade Practices Act, Wisconsin Deceptive Trade Practices Law, as well as under the consumer protection statutes of another 22 states.

**PARTIES**

18. Plaintiff, Robert Bacos ("Bacos"), is a citizen of Wisconsin who resides in Milwaukee County, WI and is otherwise *sui juris*. Bacos purchased 818 Tequila in Milwaukee County Wisconsin.

19. Plaintiff, Alin Pop ("Pop"), is a citizen of Florida who resides in Pinellas County, FL and is otherwise *sui juris*. Pop purchased 818 Tequila in Hennepin County, Minnesota.

20. Plaintiff, Andrei Tomescu ("Tomescu"), is a citizen of Illinois who resides in Cook County, IL and is otherwise *sui juris*. Tomescu purchased 818 Tequila in Cook County, Illinois.

21. Plaintiffs bring this action on their behalf and on behalf of all other persons similarly situated Class Members.

22. Defendant Calabasas Beverage Company, LLC ("Calabasas"), is a company registered in Delaware with its headquarters in Los Angeles County, CA and its mailing address in Miami-Dade County, FL.

23. Defendant K&Soda Inc. d/b/a 818 Spirits Inc. ("K&S"), is a corporation registered in Delaware with its headquarters in Miami-Dade County, FL and operating from Manhasset, New York.

24. Defendants are privately held entities, and discovery will further clarify the respective roles, responsibilities, and involvement of each Defendant in the conduct alleged in this Complaint.

**JURISDICTION AND VENUE**

25. This is a national class action, including every purchaser of 818 Tequila in the United States.

26. Upon information and belief, during the entire Class Period, Defendants sold at least 5 million bottles of 818 Tequila. Out of the 5 million bottles sold, at least 500,000 bottles were sold in Illinois.

27. Illinois constitutes a significant market for Calabasas, with 818 Tequila products widely distributed and sold through major retailers such as Binny's Beverage Depot, Kroger, Walmart, as well as numerous grocery stores and liquor retailers throughout the state.

28. The National Class is comprised of at least 500,000 people who purchased 818 Tequila during the Class Period.

29. This Court has jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a proposed class action in which: 1) there are at least 100 Class Members; 2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and 3) Defendants and Class Members are citizens of different states.

30. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related state law claims because those claims form part of the same case or

controversy as the claims over which this Court has original jurisdiction. Specifically, all of Plaintiffs' claims arise from Defendants' uniform course of conduct involving the marketing, labeling, and sale of 818 Tequila products, and are based on a common nucleus of operative facts. Accordingly, the exercise of supplemental jurisdiction is appropriate.

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred here. Plaintiff Tomescu purchased 818 Tequila in this District after being exposed to and relying upon Defendants' misleading labeling and marketing. Defendants marketed, distributed, and sold the products throughout this District, and the challenged representations were displayed to consumers here through product packaging, point-of-sale materials, and other marketing channels. Accordingly, a substantial portion of the conduct at issue occurred in this District.

**818 TEQUILA**

32. Tequila is a distilled "agave spirit" that is made from the fermented mash of the blue agave plant, with specific requirements for fermentation and distillation, and sold at specified alcohol content levels (generally between 40% and 55% ABV).

33. Tequila labeled as "100% agave" must be produced using only sugars derived from the Blue Weber agave plant. Products that contain alcohol derived from non-agave sources may not be labeled or marketed as "100% agave."

34. The "100% agave" designation signals authenticity, purity, and premium quality to consumers.

35. Consumers are willing to pay a substantial price premium for products

bearing this designation and Plaintiffs paid a premium for 818 Tequila because of the designation.

36. The designation is a key differentiator between premium tequilas (100% agave) and lower-priced alternatives (mixto - at least 51% agave) and, as a result, accurate labeling is critical to consumer choice and fair competition.

37. Defendants position 818 Tequila as a premium product and sell it at prices substantially higher than standard or mixed-sugar tequilas.

38. On product labels, packaging, and other marketing materials, Defendants represent that these 818 Tequila products are made from "100% agave" or "100% Blue Weber agave."

39. These representations are prominently displayed and intended to convey to consumers that the products are produced exclusively from agave plants.

40. Defendants' "100% Agave Azul" representations are uniform across product lines and distribution channels, including retail stores in Illinois, Wisconsin, Minnesota and in every other state.

Front Label



41. Defendants know that consumers associate the "100% agave" designation with higher quality, authenticity, and regulatory compliance.

42. At the time of purchase, Defendants represented on the front label of each bottle of 818 Tequila purchased by Plaintiffs that the product was '100% Agave Azul'. These representations appeared in uniform language, in a prominent font, on the principal display panel of the packaging and on the cap seal, and were not qualified or limited by any disclaimer.

43. Defendants publicly represent on its official website[2] and marketing materials that 818 Tequila is produced at a distillery in the Amatitán region of Jalisco, Mexico, bearing NOM 1607 (Norma Oficial Mexicana). The brand describes a single production process in which agaves from the Tequila region are slow-cooked in traditional ovens, crushed using stone tahona extraction, fermented with native yeast, and distilled in copper alembic pot stills. Because each bottle bears the NOM 1607 designation identifying the producing distillery, these representations convey that all 818 Tequila is manufactured and bottled under the authority of the same Amatitán facility belonging to Grupo Solave. See 818 Tequila, "Our Story," (https://drink818.com/pages/our-story) (last visited Mar. 4, 2026).

44. Each bottle of 818 Tequila sold in the United States bears the distillery identification number "NOM 1607," which identifies the certified tequila-producing facility responsible for manufacturing the product. Reasonable consumers understand the presence of a NOM designation on a tequila label to signify that the product was produced

[2] *See* supra FN1.

in accordance with legally recognized tequila production standards at the identified distillery. The presence of NOM 1607 on every bottle therefore reinforces Defendants' representations that the product is authentic tequila made from 100% agave and produced using the traditional methods described in Defendants' marketing materials.

45. The supplier/importer of record identified on all bottles of 818 Tequila sold in the United States is Defendant 818 Spirits Inc., Manhasset, New York.

46. All 818 Tequila products sold in the United States are produced at the same distillery, bottled at the same bottling facility, and imported into the United States and introduced into the stream of commerce by the same importing entity.

47. At the time of purchase, Defendants represented on both the front and back labels that 818 Tequila was produced in "small batch" quantities and on the front label stated that it was "handcrafted."

48. Defendants use these representations to justify premium pricing and to distinguish its products from lower-priced alternatives.

49. Defendants represent that 818 Tequila is "handcrafted" and "small batch" to suggest that it is made in small quantities and distilled in a pot still, under constant supervision of a human. "Handcrafted" is defined in Merriam-Webster Dictionary as: "created by a hand process rather than by a machine." In fact, 818 Tequila is made by machines. 818 is manufactured in a massive distillery located in Amatitán, Jalisco, Mexico.

50. 818 is produced at Grupo Solave's Casa Tequilera Los Alambiques facility a large-scale industrial distillery with multi-million-liter annual capacity.

51. There is minimal manual involvement in the production of millions of

gallons of alcohol annually. Distilling tequila at a facility producing millions of liters per year does not reasonably qualify as "handcrafted," a term typically associated with artisanal fermentation and distillation conducted in comparatively small quantities.

52. 818 operates at a scale hundreds of times larger than smaller, genuinely small-batch distilleries in Mexico that sells in the United States, and it is many times larger than most tequila producers operating in Mexico.

53. And, while 818 Tequila has undeniably gained some attention in the spirits market, largely due to the celebrity influence of its founder, Kendall Jenner, it has not yet reached the level of mainstream recognition enjoyed by Patrón tequila, Jose Cuervo tequila, or Tito's vodka.

54. While 100% agave tequila is intended to be produced solely from sugars derived from the blue Weber agave plant, typically resulting in a cleaner, more authentic agave flavor and a smoother profile, mixto tequila is required to contain only at least 51% agave sugars and may include up to 49% additional sugars, such as cane or corn sugar, during fermentation.

55. Compared to Jose Cuervo's mixto tequila, a very popular tequila brand, 818 Tequila Blanco sells for $8.5 more per bottle. That represents a 47.25% increase in price for 818 Tequila.

56. Compared to Los Cabos mixto tequila, 818 Tequila Blanco sells for $13.59 more per bottle. That represents a 103.93% increase in price for 818 Tequila.




Screenshots from https://www.totalwine.com/ (Visited on March 4, 2026)

57. As a direct result of Defendants' unfair and misleading advertising, consumers pay at least $8.50 (47.25%) more for a bottle of 818 Tequila than they would otherwise pay.

58. To evaluate the accuracy of Defendants' "100% agave" representations, Plaintiffs commissioned independent testing of 818 Tequila products identical with the ones they purchased.

59. The testing employed carbon isotope ratio analysis and nuclear magnetic resonance (NMR) methodologies commonly used in food and beverage authentication.

60. Stable isotope analyses are among the most powerful techniques to ensure

food and beverage authenticity. Based on the principle that the bioelements, C, H, O, N, of organic matter exist in their naturally occurring isotopic form - 13C/12C, 2H/1H, 18O/16O, 15N/14N - the distribution of which is influenced by physical, chemical and biochemical factors, these methods offer a means of verifying botanical, synthetic and even geographical origin of a product.

61. These scientific methods analyze the carbon isotope signatures of ethanol to determine the botanical origin of the sugars used in fermentation and are used in the European Union and approved by COFRAC (Comité Français d'Accréditation), France's sole national accreditation body, ensuring the competence and impartiality of organizations (like labs, inspection bodies) that assess conformity, granting them authority to certify quality, safety, and reliability in various sectors including spirits.

62. Ethanol derived from Blue Weber agave exhibits isotope signatures that differ measurably from ethanol derived from non-agave sources such as sugarcane or corn.

63. The testing results for the analyzed 818 Tequila products showed isotope signatures inconsistent with ethanol derived exclusively from agave.

64. Recently, Eurofins Analytics issued test results in report AR-26-AA-008787-01, affirming the presence of alcohol derived, at least in part, from non-agave sources in the 818 Tequila Blanco sample provided. Eurofins Analytics is an ISO/IEC 17025-accredited laboratory specializing in beverage authentication. The symbol "AA" designates tests conducted under accreditation issued by the French Accreditation Committee (Comité Français d'Accréditation, "COFRAC"), France's national accreditation body, with the corresponding scope of accreditation published at

http://www.cofrac.fr.

65. In the United States, Eurofins Analytical Laboratories (New Orleans, LA), an ISO/IEC 17025-accredited laboratory accredited by ANAB.

66. These findings contradict Defendants' express "100% Agave Azul" representations. Products containing alcohol derived from non-agave sources may not lawfully or truthfully be marketed as "100% agave."

67. Defendants also market and sell additional expressions of 818 Tequila, including 818 Tequila Reposado and 818 Tequila Añejo. Under standard tequila production methods, both reposado and añejo are produced by aging tequila blanco in oak barrels for defined periods, rather than through any separate fermentation or distillation process. Accordingly, because the underlying tequila blanco used to produce these aged expressions is not derived exclusively from Blue Weber agave, the reposado and añejo varieties likewise are not "100% agave."

## ECONOMIC INJURY

68. Prior to purchasing 818 Tequila, Plaintiffs read the statements appearing on the front label of the bottles they purchased, including the representations that the product was made from "100% Agave," produced in "small batch," and "handcrafted." Plaintiffs understood these statements to mean that the tequila was produced exclusively from agave sugars and manufactured using traditional small-scale methods.

69. Plaintiffs relied on these representations when deciding to purchase the product. Plaintiffs and Class Members purchased 818 Tequila products in reliance on the "100% agave" representations, as well as the "small batch" and "handcrafted"

representations.

70. Plaintiffs and Class Members paid a price premium for products marketed as "100% agave." Further Plaintiffs and Class Members paid a price premium for products marketed as "small batch" and "handcrafted."

71. Had the true composition and methods of production of 818 been disclosed, Plaintiffs and Class Members would not have purchased the products or would have paid a lower price for them.

72. Defendants possessed superior knowledge regarding the manufacturing and composition and production of its tequila products.

73. Plaintiffs allege that the true nature of the products was not reasonably discoverable by consumers at the time of purchase. Further, the only company able to perform the necessary tests in the United States refused to perform the tests for Plaintiffs citing conflict of interest concerns.

74. As a result, any applicable statutes of limitation were tolled until Plaintiffs could reasonably discover the alleged misrepresentations. Plaintiffs allege that they did not discover, and could not reasonably have discovered, the alleged misconduct.

**PLAINTIFFS**

75. Robert Bacos purchased one bottle of 818 Tequila (818 Tequila Blanco) after reading the representations on the bottle label stating that the product was "100% Agave," "small batch," and "handcrafted," on February 9, 2026, from Total Wine in Glendale, WI believing it to be made from 100% agave, made in a small batch and handcrafted. He paid $25.99+tax for the bottle he purchased.

76. Andrei Tomescu, purchased one bottle of 818 Tequila (818 Tequila Blanco) after reading the representations on the bottle label stating that the product was "100% Agave," "small batch," and "handcrafted," on January 2026, from Binny's Beverage Depot in Skokie, IL believing it to be made from 100% agave, made in a small batch and handcrafted. He paid $29.99+tax for the bottle he purchased.

77. Alin Pop purchased one bottle of 818 Tequila (818 Tequila Blanco) after reading the representations on the bottle label stating that the product was "100% Agave," "small batch," and "handcrafted," on February 2026, from Total Wine in Minnetonka, MN believing it to be made from 100% agave, made in a small batch and handcrafted. He paid $29.99+tax for the bottle he purchased.

78. After purchase, Plaintiffs realized that the spirit was not what they expected it to be. Upon testing 818 Tequila blanco, Plaintiffs realized that 818 Tequila is not 100% agave. Upon further research Plaintiffs realized that 818 Tequila is not made on a small batch and it is not handcrafted.

79. Indeed, the product Plaintiffs purchased is industrially manufactured mixed tequila. Plaintiffs therefore did not receive the small-batch, high-value spirit represented.

## CLASS ALLEGATIONS

80. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

81. Plaintiffs assert the counts stated herein as class action claims pursuant to Fed. R. Civ. P. 23.

82. Plaintiffs bring this action on behalf of all persons who purchased 818

Tequila in the United States from its initial commercial distribution in the United States in or about May 2021 through the present (the "Class Period").

83. Plaintiff Robert Bacos seeks to represent three classes composed of and defined as follows:

a. Nationwide Class: All consumers that purchased 818 Tequila in the United States.

b. Wisconsin Subclass: All consumers that purchased 818 Tequila in Wisconsin.

c. Multi-State Subclass: All consumers that purchased 818 Tequila in following states: Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Idaho, Iowa, Kansas, Louisiana, Michigan, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, South Carolina, Tennessee, Vermont, and Washington. The consumer protection statutes of these states are materially similar with Illinois, Minnesota and Wisconsin statutes. The respective statutes are: COLO. REV. STAT. § 6-1-102; CONN. GEN. STAT. § 42-110a; DEL. CODE ANN. tit. 6, § 2511; D.C. CODE ANN. § 28-3901; HAW. REV. STAT. § 480-1; IDAHO CODE § 48-603; 815 ILL. COMP. STAT. 510/1 (2024); IOWA CODE § 714.16; KAN. STAT. ANN. § 50-623 (2024); LA. STAT. ANN. § 51:1401 (2024); MICH. COMP. LAWS § 445.903; MINN. STAT. § 325F.69; MONT. CODE ANN. § 30-14-101; NEB. REV. STAT. § 59-1601 (2024); NEV. REV. STAT. ANN. § 598.0903 (2024); N.H. REV. STAT. ANN. § 358-A:2 (2024); N.J. REV. STAT. § 56:8-2 (2024); N.M. STAT. ANN. § 57-12-2 (2024); N.Y. GEN. BUS. LAW § 349 (2024); OKLA. STAT. tit. 15, § 751 (2024); S.C. CODE ANN. §

39-5-10; TENN. CODE ANN. § 47-18-104 (2024); VT. STAT. ANN. tit. 9, § 2453 (2024); WASH. REV. CODE § 19.86.010 (2024); WIS. STAT. § 100.18 (2024). The consumer protection statutes of the states comprising the Multi-State Class are materially similar in that each prohibits deceptive or misleading acts in trade or commerce and permits recovery based on uniform misrepresentations to reasonable consumers. Any variations among these statutes do not defeat class treatment because Plaintiffs' claims arise from Defendants' standardized, materially identical labeling, marketing, and production practices, which are susceptible to common proof.

84. Plaintiff Alin Pop seeks to represent three classes composed of and defined as follows:

a. Nationwide Class (defined above).

b. Minnesota Subclass: consumers that purchased 818 Tequila in Minnesota.

c. Multi-State Subclass (defined above).

85. Plaintiff Andrei Tomescu seeks to represent three classes composed of and defined as follows:

a. Nationwide Class (defined above).

b. Illinois Subclass: All consumers that purchased 818 Tequila in Illinois.

c. Multi-State Subclass: (defined above).

86. The classes exclude counsel representing the class, governmental entities, Defendants, any entity in which any Defendant has a controlling interest, any of Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this

matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other putative Class Members.

87. Plaintiffs reserve the right to amend or modify the class descriptions with greater particularity or further division into subclasses or limitation to particular issues.

88. Collectively the members of the Nationwide Class and the Subclasses shall be referred to as "Class Members".

89. This action is properly maintained as a class action under Federal Rule of Civil Procedure 23 because the proposed classes are defined by objective criteria and are readily ascertainable. Class membership can be determined through reliable and administratively feasible means, and the classes constitute a well-defined community of interest in the litigation.

90. Numerosity: At least 500,000 consumers have been injured by Defendants' deceptive marketing practices, including Plaintiffs. They have purchased 818 Tequila products and paid a premium for it in reliance on Defendants' representations. The Class is so numerous that joinder is impracticable.

91. Typicality: Plaintiffs' claims are typical of the claims of the Nationwide Class, their respective State Subclasses, and the Multi-State Class because, like other Class Members, they purchased 818 Tequila products in reliance on Defendants' uniform and misleading representations that the products were "100% agave," "handcrafted," and "small batch." Plaintiffs, like other Class Members, paid a price premium and suffered economic injury as a result of Defendants' standardized, deceptive, and misleading labeling, marketing, and uniform production practices.

92. Commonality: Common questions of law and fact exist because all Class Members purchased 818 Tequila products in reliance on uniform misrepresentations appearing on the product labeling and marketing, and because all such products were manufactured and produced in a single facility under Defendants' control. These standardized representations and uniform production practices give rise to common issues that are capable of classwide resolution.

93. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Nationwide Class, their respective State Subclasses, and the Multi-State Class. Each Plaintiff has interests aligned with, and no conflicts with, the Class Members they seek to represent, and each will vigorously prosecute this action on behalf of those classes. Plaintiffs are represented by Class Counsel experienced in complex class actions and consumer protection litigation, including cases involving alleged misrepresentations in alcohol labeling, who will likewise fairly and adequately represent the interests of the proposed classes

94. Superiority: As questions of law and fact that are common to Class Members predominate over any questions affecting only individual members, a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

**COUNT I: VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT**
**(On behalf of Plaintiff Tomescu and Illinois Subclass)**

95. Plaintiff incorporates by reference paragraphs 1-94 of this Complaint as if fully re-written herein. Tomescu asserts this count on his own behalf and on behalf of the

Illinois Subclass, as defined above, pursuant to Fed. R. Civ. P. 23.

96. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, et seq., provides protection to consumers by mandating fair competition in commercial markets for goods and services.

97. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act". 815 ILCS § 505/2.

98. The ICFA applies to Defendants' acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

99. Defendants are each a "person" as defined by section 505/1(c) of the ICFA.

100. At all relevant times, Defendants were engaged in trade or commerce within the meaning of ICFA through the marketing, labeling, distribution, and sale of 818 Tequila products in Illinois

101. 818 Tequila constitutes "merchandise" under the meaning of section 505/1(b) and its sale is within the meaning of "trade" or "commerce" under the ICFA.

102. Plaintiff and each member of the Illinois Subclass are "consumers" as defined by section 505/1(e) of the ICFA.

103. Defendants represented on the principal display panel and back label of 818 Tequila bottles sold in Illinois that the products were made from "100% Agave" and/or "100% Blue Weber Agave." These representations were uniform, prominent, and

unqualified.

104. Defendants further represented on product labels and marketing materials that 818 Tequila was produced in "small batch" quantities and was "handcrafted."

105. These representations were material because reasonable consumers attach value to tequila labeled as "100% agave," which denotes that the ethanol is derived exclusively from Blue Weber agave sugars and not from non-agave fermentable sources.

106. During the Class Period, Plaintiff purchased 818 Tequila in Illinois after reviewing the product's labeling and representations, including the "100% Agave," "small batch," and "handcrafted" claims.

107. Plaintiff relied on these representations in deciding to purchase 818 Tequila and in paying the price charged for the product.

108. Plaintiffs retained an independent, ISO/IEC 17025-accredited laboratory to analyze bottles of 818 Tequila Blanco purchased in the United States through ordinary retail channels during the Class Period. The tested bottles were the same product type as those purchased by Plaintiffs and bore the same NOM designation (NOM 1607) as the bottles purchased by Plaintiffs, identifying the same certified distillery and production facility. Because all 818 Tequila products sold in the United States are produced at this single facility and bear the same NOM designation, the tested samples are representative of the products purchased by Plaintiffs and Class Members.

109. The laboratory performed carbon isotope ratio analysis and nuclear magnetic resonance testing to determine the botanical origin of the ethanol, and the results demonstrated isotope signatures inconsistent with ethanol derived exclusively from Blue

Weber agave and consistent with the presence of ethanol derived, at least in part, from non-agave sources

110. Defendants knew or should have known the source of fermentable sugars used in the production of its tequila products and had exclusive control over that information.

111. Defendants' misrepresentations and omissions regarding the true origin of the alcohol in 818 Tequila, and the methods of production are likely to mislead reasonable consumers acting under the circumstances and, therefore deceptive and unfair acts and practices prohibited by ICFA.

112. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and members of the Illinois Subclass suffered actual damages in that they paid a price premium for 818 Tequila that they would not have paid, or would have paid less for, had the true characteristics of the product been disclosed.

113. Defendants also violated section 510/2(a)(5) of the DTPA by representing that 818 Tequila has characteristics and ingredients that it does not have.

114. The value of the loss, calculated as the price paid for a bottle of 818 Tequila product less the value of the tequila is in excess of $5,000,000 for the entire Illinois Subclass.

115. Defendants' conduct was unfair in that it offends public policy favoring truthful labeling, is immoral or unscrupulous, and causes substantial injury to consumers that they could not reasonably avoid.

116. Plaintiff and the Illinois Subclass seek actual damages, injunctive relief,

attorneys' fees, and such other relief as permitted by ICFA

**COUNT II: VIOLATIONS OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(On behalf of Plaintiff Tomescu and Illinois Subclass)**

117. Plaintiff incorporates by reference paragraphs 1-94 of this Complaint as if fully re-written herein. Tomescu asserts this count on his own behalf and on behalf of the Illinois Subclass, as defined above.

118. At all times relevant hereto, there was in full force and effect the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, et seq. ("DTPA").

119. Furthermore, Defendants represent that 818 Tequila has characteristics and ingredients that it does not have.

120. Defendants advertise 818 Tequila with the intent not to sell it as advertised by using the false and misleading advertising and marketing detailed above.

121. Defendants' false and misleading statements set forth above were made knowingly and intentionally, with the intent to mislead the named Plaintiff and the Class.

122. Accordingly, Defendants have violated the DTPA.

123. Plaintiff and the Illinois Subclass seek injunctive relief, and such other relief as permitted by DTPA.

**COUNT III: VIOLATIONS OF MINNESOTA'S PREVENTION OF CONSUMER FRAUD ACT**
**(On behalf of Plaintiff Pop and the Minnesota Subclass)**

124. Plaintiff incorporates by reference paragraphs 1-94 of this Complaint as if fully re-written herein. Pop asserts this count on his own behalf and on behalf of the Minnesota Subclass, as defined above, pursuant to Fed. R. Civ. P. 23.

125. Minn. Stat. § 325F.69 prohibits the use of any fraud, false pretense, false promise, misrepresentation, misleading statement, or deceptive practice in connection with the sale or advertisement of merchandise.

126. Defendants' representations that its tequila is "100% Agave," "Handcrafted," and "Small Batch," when such representations are misleading or untrue, constitute misrepresentations and deceptive practices within the meaning of the statute.

127. Defendants made these statements in connection with the sale and advertisement of merchandise to Minnesota consumers.

128. Plaintiff and members of the proposed class reasonably relied upon these representations when purchasing 818 Tequila products.

129. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class suffered ascertainable losses, including paying a price premium for products that were not as represented.

130. Pursuant to Minn. Stat. § 8.31, subd. 3a, Plaintiff and the Minnesota Subclass seek damages, injunctive relief, attorneys' fees, and costs.

**COUNT IV: VIOLATIONS OF MINNESOTA'S FALSE ADVERTISING LAW**
**(On behalf of Plaintiff Pop and the Minnesota Subclass)**

131. Plaintiff incorporates by reference paragraphs 1-94 of this Complaint as if fully re-written herein. Pop asserts this count on his own behalf and on behalf of the Minnesota Subclass, as defined above, pursuant to Fed. R. Civ. P. 23.

132. Minn. Stat. § 325F.67 provides that it is unlawful for any person, "with intent to sell or in anywise dispose of merchandise," to disseminate "any advertisement…

which contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."

133. Defendants disseminated advertising representing that its tequila is "100% Agave," "Handcrafted," and "Small Batch."

134. These statements constitute material assertions of fact regarding the nature, quality, and method of production of the tequila products.

135. The statements are untrue, deceptive, or misleading, and were disseminated to consumers in Minnesota.

136. By marketing its tequila as "100% Agave," "Handcrafted," and "Small Batch," Defendants made representations of fact which are untrue, deceptive, and misleading.

137. These representations were likely to mislead reasonable consumers acting under the circumstances.

138. Plaintiff seeks injunctive relief to enjoin Defendants' ongoing deceptive practices, attorneys' fees as permitted under Minn. Stat. § 8.31, subd. 3a, and such other equitable relief as the Court deems appropriate.

**COUNT V: VIOLATIONS OF WISCONSIN'S DECEPTIVE TRADE PRACTICES ACT**
**(On behalf of Plaintiff Bacos and the Wisconsin Subclass)**

139. Plaintiff incorporates by reference paragraphs 1-94 of this Complaint as if fully re-written herein. Bacos asserts this count on his own behalf and on behalf of the Wisconsin Subclass, as defined above, pursuant to Fed. R. Civ. P. 23.

140. Defendants advertise, label, and promote 818 Tequila products using

representations including, but not limited to: "100% Agave," "Handcrafted," "Small Batch."

141. Defendants disseminate these representations through product labels, and point-of-sale materials directed to consumers in Wisconsin.

142. The above representations are material to reasonable consumers because they communicate that the tequila: is produced exclusively from 100% Blue Weber agave, is produced using traditional artisanal production techniques, and is manufactured in limited quantities consistent with small-scale distillation practices.

143. These representations are false, deceptive, or misleading because Defendants' tequila products are produced through industrialized, large-scale production processes inconsistent with the ordinary consumer understanding of "handcrafted" or "small batch."

144. Defendants made these statements to induce consumers to purchase Defendants' tequila products and pay a premium price.

145. Under Wis. Stat. § 100.18, it is unlawful for any person, with intent to induce the public to enter into any obligation, to make or disseminate to the public any representation concerning merchandise that is untrue, deceptive, or misleading.

146. Defendants made representations to the public in Wisconsin regarding the nature, quality, and method of production of their tequila products.

147. These representations, including "100% Agave," "Handcrafted," and "Small Batch," constitute statements to the public within the meaning of the statute and were untrue, deceptive, or misleading and made with the intent that consumers rely upon

them in purchasing 818 Tequila products.

148. Plaintiff and members of the proposed Subclass saw and were exposed to Defendants' representations before purchasing Defendants' tequila products.

149. Plaintiff and the Class reasonably relied upon Defendants' representations in deciding to purchase the products.

150. Plaintiff and the Class paid a price premium for Defendants' tequila products as a result of the deceptive marketing.

151. Plaintiff and the Class suffered pecuniary loss as a direct and proximate result of Defendants' violations of Wis. Stat. § 100.18.

**COUNT VI: VIOLATIONS OF CONSUMER PROTECTION LAWS OF VARIOUS STATES**
**(On behalf of Plaintiffs Tomescu, Bacos, Pop and the Multi-State Subclass)**

152. Plaintiffs incorporate by reference paragraphs 1-94 of this Complaint as if fully re-written herein. Plaintiffs assert this count on their own behalf and on behalf of the Multi-State Subclass, as defined above.

153. The consumer protection statutes enacted in the states included in the Multi-State Class are materially similar to ICFA, MCFA and WTPA.

154. As such, members of the Multi-State Class are entitled to damages determined under a common methodology consistent with the measure of damages recognized under the ICFA and similarly applied by the consumer protection statutes at issue.

**COUNT VII: UNJUST ENRICHMENT**
**(On behalf of Plaintiffs Tomescu, Bacos, Pop and the Nationwide Class)**

155. Plaintiffs incorporate by reference paragraphs 1-93 of this Complaint as if

fully rewritten herein. As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated consumers.

156. By paying the high prices demanded by Defendants, Plaintiffs and Class Members conferred a direct benefit to Defendants.

157. Consumers that are members of the class continue to suffer injuries as a result of Defendants' behaviors. If Defendants do not compensate Plaintiffs, they would be unjustly enriched as a result of their unlawful act or practices.

158. It is an equitable principle that no one should be allowed to profit from his own wrong, therefore it would be inequitable for Defendants to retain said benefit, reap unjust enrichment.

159. Since Defendants unjustly enriched themselves at the expense of the Consumers, Plaintiffs request the disgorgement of these ill-gotten gains.

160. Due to Defendants' conduct, Plaintiffs and the Class Members are entitled to damages according to proof.

**COUNT VIII: NEGLIGENT MISREPRESENTATION**
**(On behalf of Plaintiffs Tomescu, Bacos, Pop and the Nationwide Class)**

161. Plaintiffs incorporate by reference all paragraphs 1-93 of this Complaint as if fully rewritten herein. As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated persons pursuant to Rule 23.

162. Defendants had a duty to be truthful in their commercial speech. In convincing the Plaintiff to purchase 818 Tequila products, Defendants made representations that they knew to be false, or negligently failed to examine the veracity of the affirmations.

163. Defendants' misrepresentations were made with the intent to induce consumers to purchase their tequila products over other tequilas that were not marketed as "100% agave," "small batch," and "handcrafted."

164. As a result of Defendants' negligent misrepresentations, Plaintiffs and the Nationwide Class Members suffered injury.

## DEMAND FOR JURY TRIAL

165. Plaintiffs and those similarly situated Class Members demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Robert Bacos, Alin Pop and Andrei Tomescu, respectfully request that judgment be entered in their favor and in favor of the Class Members as follows:

a. Certifying and maintaining this action as a class action, with the named Plaintiffs as designated class representatives and with their counsel appointed as class counsel;

b. Declaring Defendants in violation of each of the counts set forth above;

c. Awarding the Plaintiffs and those similarly situated compensatory, punitive, and treble damages in excess of $5,000,000;

d. Awarding the Plaintiffs and those similarly situated liquidated damages;

e. Order the disgorgement of ill-gotten monies;

f. Awarding each of the named Plaintiff a service award;

g. Awarding pre-judgment, post-judgment, and statutory interest;

h. Awarding attorneys' fees and costs;

i. Awarding such other and further relief as the Court may deem just and proper.

Dated: April 3, 2026

Respectfully Submitted,

/s/Dragos Boscoianu

Dragos Butucea-Boscoianu, Esq.
Access Law Group
1480 Renaissance Dr., Suite 308
Park Ridge, IL 60068
Telephone: (312) 880-7279
Email: Drey@AccessLaw.us

*Attorneys for the Plaintiffs and the Putative Class Members*